**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

PETER PADILLA,

     Plaintiff,

v.                                                    Civ. No. 17-329 GJF

NANCY A. BERRYHILL,
*Acting Commissioner of the*
*Social Security Administration*,

     Defendant.

## ORDER

THIS MATTER is before the Court upon Plaintiff Peter Padilla's ("Plaintiff's") Motion to Reverse and Remand for a Rehearing with Supporting Memorandum ("Motion"), filed on October 12, 2017. ECF No. 18. The Commissioner responded on December 4, 2017. ECF No. 20. Plaintiff filed his Reply on January 5, 2018. ECF No. 22. Having meticulously reviewed the entire record and the parties' briefing, the Court concludes that the Administrative Law Judge's ("ALJ's") ruling should be **AFFIRMED**. Therefore, and for the further reasons articulated below, the Court will **DENY** Plaintiff's Motion.

## I.    BACKGROUND

Plaintiff was born March 7, 1989. Administrative R. ("AR") 25. He graduated from high school and attended some community college classes, although Plaintiff was not sure how long he attended community college. AR 25, 45. Plaintiff previously worked for Alvarado Concepts in 2011 and 2012, although he did not remember that job, and thought he had worked at a fast food business during that time period. AR 38-39. Plaintiff also worked at the Downs race track in April 2013. AR 46. Plaintiff filed an application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") on April 1, 2013, alleging onset of disability beginning

March 5, 2013.  AR 11.  The Social Security Administration ("the SSA") denied Plaintiff's claim initially and on reconsideration.  AR 11.  Plaintiff then requested a hearing, which was held in front of ALJ Eric Weiss on October 14, 2015.  AR 11.  Plaintiff testified at the hearing, as did Evelyn R. Hartman, a vocational expert ("VE").  AR 11.  Plaintiff was represented by counsel. AR 11.

On January 8, 2016, ALJ Weiss issued his decision that Plaintiff was not disabled from March 5, 2013, through the date of his decision.  AR 26-27.  Plaintiff subsequently asked the SSA's Appeals Council ("AC") to review ALJ Weiss's decision, but the AC denied his request. AR 1.  As a consequence, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 422.210(a) (2017).  Plaintiff timely filed his appeal in this Court on March 10, 2017. ECF No. 1.

## II.    PLAINTIFF'S CLAIMS

Plaintiff makes two primary claims.  First, he contends that the ALJ improperly picked and chose from the non-exertional limitations assessed by examining psychologist Mark A. Arcuri, Ph.D, and non-examining state agency psychologists Dr. Renate Wewerka, Ph.D., and Dr. Suzanne Castro, Psy.D.  Pl.'s Mot. 18-21, ECF No. 18.  Specifically, Plaintiff asserts that the ALJ failed to include certain limitations from their opinions in Plaintiff's Residual Functional Capacity ("RFC") without explaining his failure to include them.  *Id.* at 18-21.  Second, Plaintiff alleges that the ALJ erred by failing to conduct a Drug Addiction and Alcohol ("DAA") determination in accordance with Social Security Ruling ("SSR") 13-2p.  *Id.* at 21-24.[1]

---

[1] Plaintiff also notes that he "can at times be a problematic historian[,]" but does not actually challenge the ALJ's unfavorable credibility determination.  Pl.'s Mot. 18-21, ECF No. 18; *see* AR 18 (ALJ finding Plaintiff's statements concerning his symptoms to be not fully credible).  Because this information is briefed more as an observation of Plaintiff's background, as opposed to a claim for relief, the Court need not and does not address it further.

## III. APPLICABLE LAW

### A. Standard of Review

When the Appeals Council denies a claimant's request for review, the ALJ's decision becomes the final decision of the agency.[2] The Court's review of that final agency decision is both factual and legal. *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992)) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence.")

The factual findings at the administrative level are conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g) (2012). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. Substantial evidence does not, however, require a preponderance of the evidence. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.

As for the review of the ALJ's legal decisions, the Court reviews "whether the ALJ

---

[2] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g) (2012), which generally is the ALJ's decision, not the Appeals Council's denial of review. 20 C.F.R. § 404.981 (2018); *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Lax*, 489 F.3d at 1084.  The Court may reverse and remand if the ALJ failed "to apply the correct legal standards, or to show . . . that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

Ultimately, if substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214, *Doyal*, 331 F.3d at 760.

**B.**     **Sequential Evaluation Process**

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2018).  At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1.  If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's residual functional capacity ("RFC"). *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(e), 416.920(e).  In phase two, the ALJ determines the physical and mental demands of the claimant's past relevant work, and in the third phase, compares the claimant's RFC with the functional requirements of his past relevant work to determine if the claimant is still capable of performing his past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(f), 416.920(f).  If a claimant is not prevented from performing his past work, then he is not disabled.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant bears the burden of proof on the question of disability for the first four steps, and then

the burden of proof shifts to the Commissioner at step five.  *See Bowen v. Yuckert*, 482 U.S. 137,

146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

If the claimant cannot return to his or her past work, then the Commissioner must show at

the fifth step that the claimant is nonetheless capable of performing other jobs existing in

significant numbers in the national economy.  *See Thomas*, 540 U.S. at 24-25; *see also Williams

v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation

process in detail).

**IV.     THE ALJ'S DECISION**

At step one, the ALJ found that Plaintiff met the insured status requirements of the Social

Security Act through June 30, 2014, and had not engaged in substantial gainful activity since the

alleged disability onset date of March 5, 2013.  AR 14.  At step two, the ALJ determined that

Plaintiff had the following severe impairments: reading disorder; mathematics disorder; disorder

of written expression; learning disorder, not otherwise specified; psychotic disorder; post-

traumatic stress disorder ("PTSD"); anxiety state; depressive disorder; schizophrenia; traumatic

brain injury; and alcohol abuse.  AR 14.  The ALJ used the Psychiatric Review Technique

("PRT") to determine that the severity of Plaintiff's mental impairments "do not meet or

medically equal the criteria of listings 12.02, 12.03, 12.04, 12.05, 12.06, and 12.09."  AR 15-17.

The ALJ also considered whether the following conditions were severe: status post-

hernia repair, history of right thumb laceration, and history of cellulitis with MRSA of the lower

right extremity.  AR 14.  The ALJ concluded that those conditions were not severe, in part

because of Plaintiff's inconsistency in "his reporting as to when and how he obtained the

inju[ries]" and because "very few significant findings were noted at an August 2013 consultative

examination performed by Dr. [Sylvia M.] Ramos, [M.D.]."  AR 14.  In particular, "Dr. Ramos

noted that sometimes the extent of [Plaintiff's] effort expended in the tasks presented to him in the evaluation was not clear" and Dr. Ramos ultimately "opined that [Plaintiff] could sit, stand, walk, lift, carry, handle small objects, hear, speak and travel with no difficulties." AR 14. Because the ALJ accorded Dr. Ramos's opinion "great weight," and the ALJ found "no evidence that any of these conditions have either met the durational requirements of this program, or that they create any specific functional limitations regarding [Plaintiff's] ability to perform work related activities[,]" the ALJ found that Plaintiff's status post-hernia repair, history of right thumb laceration, and history of cellulitis with MRSA of the lower right extremity were not severe impairments. AR 14-15.

At step four, the ALJ determined Plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that [Plaintiff] has the [RFC] to perform a full range of work at all exertional levels but with the following non[-]exertional limitations: [Plaintiff] is able to understand, remember and carry out simple instructions and make commensurate work related decisions but not at a production pace, and in a work setting with few changes. [Plaintiff] is able to interact occasionally with supervisors, coworkers and the public. [Plaintiff] is able to maintain concentration, persistence and pace for two (2) hours at a time during the workday, with normal breaks.

AR 17.

In determining Plaintiff's RFC, the ALJ considered Plaintiff's testimony [AR 18-19, 22, 38-58], the extensive medical record, and other non-medical evidence.[3] AR 17-25. The ALJ considered the opinions of treating psychologist Dr. Arcuri [AR 298-313], consultative physical examiner Dr. Ramos [AR 315-20], consultative psychological examiner Dr. Susan Flynn, Ph.D. [AR 321-25], state agency disability consultants Dr. Wewerka [AR 70-81] and Dr. Castro [AR

---

[3] In evaluating Plaintiff's credibility, the ALJ concluded that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not fully credible[.]" AR 18.

96-108], and Certified Nurse Practitioner ("CNP") Marie Mugavin, Ph.D. [AR 446-51][4]. The ALJ considered Plaintiff's transcripts from Rio Grande High School [AR 273-75] and Central New Mexico Community College [AR 287-97], records from Dragonfly Counseling Associates [AR 346-60], records from the University of New Mexico Health Sciences Center [AR 381-445], treatment records from Albuquerque Health Partners [AR 361-80], treatment records from Sage Neuroscience Center [AR 330-45], and third party statements from Allen Methvin [AR 276-78] and Gloria Gutierrez [AR 285-86]. Lastly, the ALJ reviewed the hearing testimony of the VE [AR 26, 58-65].[5]

*Dr. Mark A. Arcuri, Ph.D.*

Dr. Arcuri examined Plaintiff on November 28, 2012. AR 298. The ALJ ultimately afforded "significant weight" to Dr. Arcuri's opinion because "his objective findings, as well as [Plaintiff's] rather benign subjective complaints to Dr. Arcuri, support the opinion." AR 22-23. Plaintiff was referred to Dr. Arcuri by Monica Lopez at the New Mexico Division of Vocational Rehabilitation because, according to Dr. Arcuri, Plaintiff "wants to attend school and because of a history of learning problems he will likely need assistance from Special Services at CNM." AR 298. Dr. Arcuri noted that he did not have any records available to review, and that there were "possible mental health concerns as well." AR 298. Plaintiff reported to Dr. Arcuri a hernia repair resulting in chronic pain that Plaintiff stated was "debilitating and significantly disrupt[ed] his life." AR 299. Dr. Arcuri did not otherwise have any information about Plaintiff's medical history. AR 298-99.

---

[4] Dr. Mugavin's opinion is not reviewed in detail by the Court because Plaintiff did not challenge the ALJ's evaluation of her opinion.

[5] The VE's testimony is not at issue in this appeal, and thus the Court will not further discuss it.

Plaintiff told Dr. Arcuri that he was married and living at Joy Junction, a homeless shelter in Albuquerque, with his wife and daughter. AR 298. During later examinations and evaluations, Plaintiff told other health care providers that he was not married and did not have any children, "but that he lived with his long-term girlfriend until she assaulted him with a skateboard in April 2013." AR 19. Plaintiff also told Dr. Arcuri that he "would like to get health insurance through the State of New Mexico," but "claims he 'cannot get the paperwork together.'" AR 298. Plaintiff reported that he did not have a driver's license because of "concern about fossil fuels," but did report to Dr. Arcuri that he drank socially and used marijuana daily for pain and anxiety. AR 308.

Dr. Arcuri observed that Plaintiff was "neatly groomed" and "cooperative and friendly during testing and he seemed forthright with information." AR 299. Dr. Arcuri also observed that Plaintiff was "a personable man who presented as deeply concerned about his situation and with related anxiety." AR 299. Plaintiff "was unable to complete self-report instruments due to reading problems," but Dr. Arcuri opined that Plaintiff had "put forth a good effort in today's testing," and therefore "the current test results are likely to be an accurate assessment of his present cognitive, psychological, and academic functioning." AR 299.

To evaluate Plaintiff, Dr. Arcuri interviewed him, obtained a brief psychosocial history, stated that he reviewed supporting records (even though he had previously stated in the report that he did not have any medical records available to review), and conducted several standardized tests. AR 299. Plaintiff scored 27 out of 30 points on the Mini Mental Status Examination and "[t]here was no evidence of problems with executive functioning or with general information retrieval." AR 299-300. Plaintiff committed errors in Attention and Calculation, which were "most likely related to his academic limitations." AR 300. With respect to cognitive status, Dr.

Arcuri observed that Plaintiff was alert, oriented to person, place, time, and situation, and did not have any active suicidal or homicidal ideation. AR 300. Plaintiff also denied ever experiencing hallucinations or delusions. AR 300. Plaintiff described his mood as "okay" and appeared anxious, but his affect was full-range and mood-congruent, his speech was normal, and his verbalizations were "expansive and appropriate to questions asked and in general conversation." AR 300. Plaintiff "was able to think in a future-oriented way, and he could elucidate the general steps required to reach possible goals. His insight seemed fair." AR 300. Plaintiff's performance on a standardized test designed to ascertain frontal lobe functioning, which is related to executive planning and related skills, "suggested no problems[.]" AR 300.

Plaintiff's performance on a different standardized test placed him "at the lower end of the [a]verage range of intellectual functioning," and demonstrated that his "propensity for nonverbal . . . tasks is significantly better than for verbal tasks." AR 303. Dr. Arcuri noted that "[i]ndividuals who score as [Plaintiff] did tend [to] do best with hands-on, nonverbal tasks in most areas of learning and work." AR 303. Plaintiff's results from yet another standardized test indicated that "he works more slowly than approximately 68% of his age peers do . . . suggesting that he will probably want to avoid working in strictly time-sensitive settings. In school, he will benefit from time accommodations to reduce stress and further degradation of processing speed, so that he has the opportunity to perform to the best of his ability." AR 304.

Dr. Arcuri opined, "[Plaintiff] is a man whose intellectual ability as tested today is in the Low Average (verbal) to Average (nonverbal) range and with weak memory and processing speed skills relative to his age peers although the scores are consistent with his overall abilities. The most significant finding among the cognitive data was of problems with general verbal processing." AR 304. Dr. Arcuri continued, "He will do best on tasks that rely on non-verbal and

in the moment reasoning, such as the ability to examine a problem, draw upon visual-motor and visual-spatial skills, organize thoughts, create solutions, and then test them." AR 304. Plaintiff was likely to have problems with "comprehending written information, difficulties with proof-reading, and a dislike of having to perform under stress, and a general need for more time in order to complete tasks to the best of his ability." AR 304.

Dr. Arcuri identified the following considerations that would give Plaintiff "the best chance of succeeding vocationally":

(1) Emphasis on nonverbal tasks in general for learning and in the workplace;
(2) In school use peer-mediated learning: Pair off with another student of different ability levels to review notes, study for a test, read aloud to each other, etc.;
(3) Extra time on timed tasks as needed; it is preferred that he will work in untimed settings and in school he will benefit from the maximum 2x for examinations;
(4) Hands-on/verbal training with supervision until tasks are mastered, reminders in [the] form of pictures and diagrams, etc.;
(5) Extra time on timed tasks as needed; it is preferred that he will work in untimed or loosely timed settings;
(6) A Reader for examinations; consider books on tape if available and/or study-buddy to help with reading;
(7) Tape record lectures;
(8) Use of a calculator on mathematics tests, as well as a notebook for formulas if necessary; [and an]
(9) Environment where success does not depend on formal academic writing skills.

AR 304, 310. Dr. Arcuri opined that "[Plaintiff's] verbal processing, memory, and processing speed abilities constitute potential vocational barriers in that he does not work as efficiently as others do on tasks that rely on these skills, which puts him at a disadvantage." AR 304-05. Plaintiff's symptoms "reportedly interfere with his ability to carry out day-to-day tasks although when working[,] the structure does motivate him to be consistent with that." AR 308.

Dr. Arcuri concluded that Plaintiff:

Will learn job skills best in a hands-on environment, and [ ] job tasks should include hands-on training as well as pictures and diagrams for best synthesis . . . [h]e should seek work in a setting where he can work at his own pace since he

> works more slowly than the majority of his peers do. His academic skills significantly limit training and work opportunities. He also has problems sustaining concentration and managing competing demands, although these may lessen with successful treatment of his mood problems.

AR 309. Dr. Arcuri also opined that Plaintiff's "ability to communicate in writing is impaired. He also has some oral receptive problems related to poor concentration and attention." AR 309. Dr. Arcuri wrote that Plaintiff stated that he could "get along with others both in and out of the work place" but "he does seem to have a more recent history of anxiety related to PTSD that at times results in discomfort when around too many people." AR 309. Dr. Arcuri noted that while Plaintiff's mood problems "could potentially affect self-care at times," he is "apparently able to attend to [Activities of Daily Living] without problems." AR 309.

With respect to limitations on self-direction, Dr. Arcuri concluded that "[a]ttentional problems . . . do impact his ability to shift focus among tasks to some degree and could interfere with task completion . . . it is possible that mood and anxiety problems could sometimes affect his abilities in this regard." AR 310. Regarding work skills, Dr. Arcuri opined that "[Plaintiff's] academic levels limit his work skills where such skills are required. His mood problems affect his ability to process and use complex information. He performs tasks more slowly than the majority of his age peers do[.]" AR 310. Plaintiff told Dr. Arcuri that "he has no problems tolerating a regular work day," but "he does experience chronic pain and this could sometimes affect this." AR 310.

Regarding ability to work, Dr. Arcuri concluded that "[Plaintiff] appears to possess the necessary aptitudes, skills, and abilities to work provided that an appropriate vocation is agreed upon. . . . [h]is most significant challenges at the current time are due to his cognitive/academic challenges, and his mood problems." AR 310. Dr. Arcuri recommended that Plaintiff "pursue a

counseling relationship and that he have an evaluation for medication therapy. He should pursue options for legitimate medical marijuana status." AR 311.

Ultimately, Dr. Arcuri diagnosed Plaintiff with the following conditions: probable PTSD, reading disorder, mathematics disorder, disorder of written expression, and learning disorder not otherwise specified affecting verbal processing. AR 312. Dr. Arcuri also noted a deferred diagnosis with respect to Axis II, that Plaintiff used marijuana medicinally but was not prescribed marijuana, and psychosocial and environmental problems. AR 312. Dr. Arcuri assessed a Global Assessment of Functioning ("GAF") score of 55.[6] AR 312.

*Dr. Sylvia M. Ramos, M.D.*

Dr. Ramos was Plaintiff's consultative physical examiner, and she examined him on August 6, 2013. AR 315. The New Mexico Disability Determination Services ("DDS") referred Plaintiff to Dr. Ramos. AR 315. Dr. Ramos noted that Plaintiff was referred to her for evaluation of allegations of PTSD, anxiety, depression, hernia problems, and a right thumb injury. AR 315. The ALJ ultimately assigned "great weight" to Dr. Ramos's opinion because it was "consistent with the medical evidence of record related to [Plaintiff's] physical health, and is consistent with [Plaintiff's] subjective complaints, or lack thereof, in those areas of functioning." AR 14-15. Dr. Ramos observed that Plaintiff's "medical history was somewhat scattered and unclear. Throughout the interview he sat at the very corner of the room leaning into the wall with his arms and legs kept in tort [*sic*] himself and looking at the floor." AR 315.

Plaintiff told Dr. Ramos that he had gotten into trouble for having drug paraphernalia "and was sent to see a drug counselor." AR 315. Plaintiff said that he was kidnapped while he was in

---

[6] The Global Assessment of Functioning test is "widely used for scoring the severity of illness in psychiatry." See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2880316/#B14 (last visited August 13, 2018). A GAF score of 55 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." See https://msu.edu/course/sw/840/stocks/pack/axisv.pdf (last visited August 13, 2018).

middle school, but eventually escaped.  AR 315.  Plaintiff stated that he was unable to work because "he has been told that he has different people in him and [it] is not safe for him to be at work.  The last time he worked was at a Pizza Hut a year ago."  AR 315.  With respect to substance abuse, Plaintiff admitted that he "uses marijuana because it makes him stop making noises and [it] helps him feel less stressed.  The last time he used any was a week ago.  He drank alcohol two weeks ago.  He tries also [to] smoke cigarettes."  AR 315.

Plaintiff reported past work in the fast food industry, and recounted that he was fired last year because he:

> [W]as having a bad day and freaked out and beat his manager.  At the time he was being kicked out of his apartment.  He states that he does not want to have relationships with his family because they all sell drugs. . . . [h]e is not married and has no children.  He stated to the staff in the office that he could not fill out the short intake form because [he's] unable to read or write.

AR 315.

Regarding physical injuries and impairments, Plaintiff said he was recently assaulted and robbed because he was homeless and "suffered a right thumb injury" that had to be sutured, and although it had healed, he still had pain.  AR 316.  Plaintiff also reported two hernia surgeries in 2004 and 2007, and that he still felt sore and experienced "a pinching pain in the medial aspect of the repair."  AR 316.  Plaintiff also had a right leg infection secondary to a spider bite approximately two months before Dr. Ramos's evaluation, and he was treated with antibiotics, although it still hurt when he walked.  AR 316.

Dr. Ramos found Plaintiff's affect to be "somewhat peculiar," noting that he "moved slowly and did not make eye contact," that "[h]e took quite some time to undress and folded his clothes carefully," and that "at the end of the interview a tiny little spider walked into the room and he cried out and looked frightened.  He quickly pulled his legs up on the table and then also

dressed quickly." AR 316. Dr. Ramos also noted that Plaintiff "understood and followed directions well," but that "[s]ometimes the extent of effort expended in the evaluation tasks was not clear." AR 316.

Physically, the only abnormal findings Dr. Ramos made were that Plaintiff "complained of pain in the right side," "[h]e was not able to squat because he said that [his] hernia area hurt," his waist rotation was 50% of the normal range, and he had less right hip flexion because of inguinal pain. AR 317. Dr. Ramos did not note anything out of the ordinary with respect to Plaintiff's hands except that he had a trigger right middle finger. AR 317. Notably, Plaintiff "read aloud a selection from the Readers Digest and he read it rather quickly including words like exclusive, trusted, confidence, citizens, [and] Abraham Lincoln. He appeared to understand the passage well." AR 317.

Regarding psychological impressions, Dr. Ramos stated that "[i]t was difficult to evaluate his mental status bar because it seemed to be erratic but not irrational." AR 317. Plaintiff otherwise complained of right thumb pain and right leg pain secondary to trauma. AR 317. Functionally, in terms of physical capacity, Plaintiff was able to sit, stand, walk, lift, carry, handle small objects, hear, speak, and travel. AR 317.

*Dr. Susan Flynn, Ph.D.*

Dr. Flynn is a consultative psychological examiner who evaluated Plaintiff on August 9, 2013, three days after Dr. Ramos's examination. AR 321. Dr. Flynn's evaluation also occurred a little more than four months after Plaintiff filed his disability claim and about eight months after Dr. Arcuri's evaluation. The New Mexico DDS referred Plaintiff to Dr. Flynn. AR 321. The ALJ assigned limited weight to Dr. Flynn's opinion because Dr. Flynn noted that the possible causes of Plaintiff's much lower score in the mini mental status exam were a psychotic break,

being under the influence of something, or malingering. AR 23. The ALJ further reasoned that Dr. Flynn's opinion as to Plaintiff's level of functioning was "inconsistent with the objective findings and treatment records associated with [Plaintiff's] record." AR 23. Additionally, because Dr. Flynn noted the possibility of malingering, and her opinion was based on Plaintiff's "bizarre presentation at the evaluation," which was inconsistent with "how he presented at prior and subsequent evaluations," the ALJ appeared to discount Dr. Flynn's opinion. AR 23.

Dr. Flynn evaluated Plaintiff by interviewing him, administering the mini mental status exam, and considering a diagnostic form from Dragonfly Counseling dated March 21, 2013, and Dr. Arcuri's report. AR 321. Describing Plaintiff's behavior, Dr. Flynn observed that he rubbed his eyes frequently, "[h]e bent over sideways with his head on the arm of the couch," and "[w]hen he left the office, he slithered along the door and then along the wall down the hall with his head down and turned to the side, as if he were listening and watching something I could not see or hear." AR 321. Similar to his report to Dr. Ramos, Plaintiff claimed he had been kidnapped as a child, and also stated that he had never married and did not have children. AR 322. Dr. Flynn cast doubt on Plaintiff's statement that he graduated from high school in 2010, because he would have been twenty-one years old when he graduated. AR 322.

Regarding past work, Plaintiff told Dr. Flynn he used to work at Taco Bell (as opposed to Pizza Hut, which is what Plaintiff told Dr. Ramos), and that he was doing well until one day he "got broken down." AR 322. The next day, Plaintiff was surprised to learn that surveillance video from Taco Bell "showed the manager pushing him and [Plaintiff] hitting him back. The manager was in the hospital with a dislocated jaw, missing teeth and broken ribs. He told [Plaintiff] it was okay. [Plaintiff] has no memory of the incident. He was fired. His mother got

him a job at the Downs in June 2013 and he worked for two days, he thinks. He has no memory of this, either." AR 322.

With respect to mental health, Plaintiff told Dr. Flynn that he could not leave the house because he saw "the colors of evil around everyone, like an aura. He said I had a white and yellow aura suggesting I was peaceful." AR 322. Regarding substance abuse, Plaintiff told Dr. Flynn that he started drinking alcohol at age seven and started using marijuana at age ten. AR 322. Plaintiff claimed he stopped drinking alcohol at age ten.[7] AR 322. Plaintiff also claimed he stopped using marijuana three months earlier.[8] AR 322. Plaintiff had never been hospitalized in a psychiatric facility, and told Dr. Flynn he had counseling at Dragonfly pursuant to a court order for possession of marijuana. AR 322.

> In terms of medical history, Plaintiff reported having hernia surgery and experiencing pain throughout his body as a result. AR 323. Plaintiff also told Dr. Flynn he had surgery on his left leg for a spider bite in June 2013.[9] AR 323. Plaintiff also stated that his girlfriend assaulted him and stabbed him in the right thumb, and as a result he could not fill out applications. AR 323.

Dr. Flynn observed that Plaintiff's "facial expression was mobile as he made faces or hid his face in his hands. His eye contact was almost non-existent. . . [h]is attitude was withdrawn and frightened. His attention was erratic." AR 323. Although he spoke in a normal tone and at a normal rate, Plaintiff showed "significant signs of receptive aphasia as he did not seem to understand the questions." AR 323. Dr. Flynn additionally observed:

> [Plaintiff's] thought processes were disorganized and illogical. The content of his thoughts was bizarre and perhaps delusional. He admitted he thinks of harming others but could not say who or what he meant. He admitted he sees 'a glow

---

[7] Plaintiff told Dr. Arcuri he drank socially [AR 308] and told Dr. Ramos he last drank alcohol two weeks previously [AR 315].

[8] Plaintiff told Dr. Ramos he had last used marijuana the previous week. AR 315.

[9] Plaintiff told Dr. Ramos he had been treated with antibiotics for his spider bite and did not mention surgery. AR 316. Plaintiff did consistently relate to both Dr. Ramos and Dr. Flynn when the spider bite occurred. *See* AR 316, 323.

around someone' and gave examples of how evil people have a red and black color. He says he hears voices but does not listen and went on to say in a rambling way that the dog next door stares at him and he wonders about that. [Plaintiff's] affect seemed flat without much energy and with an anxious quality.

AR 323. Plaintiff scored 14 out of 30 points on the mini mental status exam, which was in the range of moderate cognitive impairment. AR 323. Although Dr. Flynn stated that the cause of this significant decline in cognitive functioning was unknown, she reasoned that possible causes included a psychotic break, Plaintiff being under the influence of something, or malingering. AR 323. Dr. Flynn further observed that Plaintiff claimed not to know the month, date, day of the week, or the season. AR 323. Plaintiff also claimed not to know the name of the state he was in, did not understand certain questions, could not repeat a short phrase, and was unable to correctly copy a geometric figure, although Plaintiff printed legibly using his right hand. AR 323. In general, Dr. Flynn opined that Plaintiff had intact judgment but impaired impulse control, with limited insight, limited amount of ordinary knowledge, and limited concrete reasoning. AR 323-24.

Dr. Flynn concluded that Plaintiff had difficulty paying attention, which led to memory failures, that Plaintiff could not recount his life history coherently, that he gave several hard-to-believe stories that "may or may not be true, but he reported everything with the same detached attitude and almost no affect." AR 324. Dr. Flynn opined that Plaintiff's symptoms did not meet the criteria for PTSD, but that he presented with psychotic symptoms. AR 324. Dr. Flynn also noted that, despite Plaintiff reporting to her that he has comprehension problems, dyslexia, and is homeless, Plaintiff stated that he always spent his money on books. AR 324.

Dr. Flynn diagnosed Plaintiff with psychotic disorder not otherwise specified, a deferred diagnosis on Axis II, hernia problems, socioeconomic problems,[10] and found that his GAF score was 25. AR 324. Dr. Flynn also noted that malingering should be ruled out. *See* AR 324. Dr. Flynn opined that Plaintiff was "not capable of managing his own benefits because he has difficulty with attention, memory and comprehension." AR 324.

*Dr. Renate Wewerka, Ph.D.*

Dr. Wewerka is a non-examining state agency disability consultant who reviewed Plaintiff's records and wrote a report dated August 29, 2013. AR 76. The ALJ assigned significant weight to Dr. Wewerka's opinion because it was "supported by [Plaintiff's] medical evidence of record, specifically Dr. Arcuri's examination findings and opinions, as well as [Plaintiff's] subjective reports that he gets along ok with other people and actually enjoys conversing with others, and that he is able to follow instructions ok and was able to watch his young nephews while his brother worked." AR 22. Dr. Wewerka reviewed the opinions of Dr. Ramos, Dr. Flynn, and Dr. Arcuri, and reviewed records from Dragonfly Counseling as well as unidentified third party function reports. AR 71-73. Dr. Wewerka concluded that Plaintiff had the severe impairment of schizophrenia and other psychotic disorders, and considered the listing for that disorder (Listing 12.03). AR 74, 76.

As part of the PRT, Dr. Wewerka concluded that Plaintiff had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. AR 75. Dr. Wewerka did not conclude that Plaintiff had repeated episodes of decompensation. AR 75. Dr. Wewerka noted that in March 2013, a non-acceptable medical source diagnosed Plaintiff with cannabis

---

[10] Dr. Flynn diagnosed Plaintiff with problems with employment, housing, access to health care, and economic problems generally. AR 324.

dependence with physiological dependence with early full remission, alcohol abuse, and PTSD.

AR 75. Dr. Wewerka also concluded that "[d]ue to his unusual and inconsistent presentation, [Plaintiff's] credibility is eroded." AR 76.

In section I of the mental RFC assessment, Dr. Wewerka concluded that Plaintiff had understanding and memory limitations and was moderately limited in ability to understand and remember detailed instructions. AR 77-78. Plaintiff also had sustained concentration and persistence limitations. AR 78. In particular, Plaintiff was moderately limited in the following categories:

(1) Ability to carry out detailed instructions;
(2) Ability to maintain attention and concentration for extended periods;
(3) Ability to work in coordination with or in proximity to others without being distracted by them; and
(4) Ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

AR 78. Plaintiff was also moderately limited in the following areas of social interaction:

(1) Ability to interact appropriately with the general public;
(2) Ability to accept instructions and respond appropriately to criticism from supervisors; and
(3) Ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

AR 78. Dr. Wewerka also concluded that Plaintiff was limited in ability to adapt, but did not assess limitations in any specific category of function. AR 79.

For Plaintiff's mental RFC, Dr. Wewerka wrote, "If maintaining abstinence and sobriety [Plaintiff] can understand, remember, and carry out detailed, but not complex instructions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a work setting." AR 79. Dr. Wewerka provided no further explanation. In Section III, which asked Dr. Wewerka to "explain in narrative form" Plaintiff's

limitations, for each category Dr. Wewerka wrote "see PRTF[.]"  AR 78-79.  Dr. Wewerka acknowledged that Dr. Flynn's opinion was more restrictive, but stated that Dr. Flynn's opinion contrasted sharply with the other evidence in the record and was therefore less persuasive.  AR 79.  Without additional explanation, Dr. Wewerka stated that Dr. Flynn's opinion was "an overestimate of the severity of the individual's restrictions/limitations and [was] based only on a snapshot of the individual's functioning."  AR 80.

With respect to DAA, Dr. Wewerka wrote that substance abuse was documented, "but a DAA material determination is not required."  AR 81.  Dr. Wewerka did not further explain that statement.  Overall, Dr. Wewerka determined that Plaintiff was not disabled.  AR 81.

*Dr. Suzanne Castro, Psy.D.*

Dr. Castro is a non-examining state agency disability consultant who reviewed Plaintiff's records at the reconsideration stage and wrote a report dated December 9, 2013.  AR 103.  The ALJ assigned significant weight to Dr. Castro's opinion because it was "supported by [Plaintiff's] medical evidence of record, specifically Dr. Arcuri's examination findings and opinions, as well as [Plaintiff's] subjective reports that he gets along ok with other people and actually enjoys conversing with others, and that he is able to follow instructions ok and was able to watch his young nephews while his brother worked."  AR 22.  Dr. Castro reviewed the same records as Dr. Wewerka.  AR 97-100.  Dr. Castro noted that she reviewed all available medical evidence and that she affirmed Dr. Wewerka's opinion as written.  AR 103.  Dr. Castro assessed the same moderate limitations as Dr. Wewerka.  AR 104-106.  Upon reconsideration, Dr. Castro wrote, "There are no allegations of changes, worsening, or new conditions. . . There is no new [medical evidence of record] in the file to support changes in severity from the initial assessment."  AR

103, 106. Dr. Castro's evaluation also contained the same statement about a materiality determination for DAA, and similarly concluded that Plaintiff was not disabled. AR 108.

*Plaintiff's testimony*

At Plaintiff's administrative hearing, the ALJ began his questioning of Plaintiff by asking about his past work, noting that he worked for Alvarado Concepts from 2011 to 2012. AR 38. Plaintiff testified that he did not recall that job, but he believed he worked in fast food during that time period, although he did not remember specifically where he worked. AR 38-39. The ALJ asked Plaintiff who put his work history together, and Plaintiff testified that he did not recall. AR 39-40. The ALJ then asked whether Plaintiff remembered anything, and Plaintiff replied that he did not remember "too much." AR 40.

Plaintiff testified that he was homeless and usually stays at his friend Allen's pop-up trailer. AR 40. Before staying with Allen, Plaintiff lived with his brother for almost a year, but his brother moved out of his home to get away from Plaintiff. AR 40. Plaintiff testified that he occasionally babysat his brother's children, but that stopped when they moved away because his brother was scared of Plaintiff's "episodes." AR 41. Plaintiff later clarified that he stayed with his brother's children "most of the time," but that his sister would "come by and watch them too as well, to make sure everything's okay." AR 44. Much later in the hearing, Plaintiff said he only kept an eye on his brother's children "for a couple of seconds because my sister would always come." AR 56. Plaintiff stated that he never harmed his brother's children, but that his brother was worried about it. AR 41.

Plaintiff testified that he generally had panic attacks and experienced high anxiety on a daily basis. AR 42. Plaintiff also stated that he could not remember "what to do nowadays, and it's a little hard for me to remember. So I have to find people that will remind me." AR 43. His

friends reminded Plaintiff to take a shower, brush his teeth, comb his hair, and wear clean clothes. AR 43. Plaintiff ate meals with his friends. AR 44. Plaintiff stated that he has not had a girlfriend since 2013 when his former girlfriend assaulted him. AR 44-45.

Plaintiff testified that he attended community college sometime in 2013, although he could not remember for how long, but that he eventually stopped attending classes because he "couldn't deal with the people's stress and anxiety." AR 45-46. Plaintiff stated that he had a job at the Downs casino as a bus boy in April 2013, but he was fired for having a panic attack, and did not recall how long he worked there. AR 46. Plaintiff testified that he had a panic attack because "one of the customers [was] asking for something, and more customers started asking, and I just couldn't deal with it, and I fell on the floor and started, you know, covering myself." AR 46. The ALJ asked whether Plaintiff actually lay down on the floor and covered himself, and Plaintiff responded affirmatively, relating that his mother had to come and pick him up. AR 46-47.

Regarding his symptoms of mental illness, Plaintiff testified that he experienced high anxiety and stress on a daily basis, with "some migraines here and there," confusion, and disorientation. AR 48. To handle his high anxiety and stress, Plaintiff took Abilify and hydroxyzine. AR 48. Those medications helped Plaintiff "cope with things." AR 48. The medication improved Plaintiff's symptoms for a couple of hours until the medication wore off. AR 48. In response to the ALJ's question about whether the medication helped Plaintiff cope with things better if he took it as he was supposed to, Plaintiff testified that the medication did "not really" help him cope because he "kind of [has] little worries that'll, you know, the medication won't stop, and I won't be able to do anything. So they increased the dosage, and now it just makes me drowsy enough where I can't really do anything." AR 49. With respect to auditory hallucinations, Plaintiff heard his name being pronounced even when he took his

medication.  AR 49.  Plaintiff also had visual hallucinations of auras around people, even when he took his medication.  AR 52.

Regarding his educational problems, Plaintiff testified that he could not spell or remember, that he needed constant reminders, and required recording of his classes and someone else to take notes for him because he "couldn't spell right.  And then I had a computer that spells for me when I talked into it."  AR 57.

Plaintiff also testified that he did not use illegal drugs or abuse alcohol anymore, and that he had abstained for approximately one week before the hearing.  AR 49.  Plaintiff testified that he used marijuana and drank alcohol heavily, and it had been about one week since he drank heavily.  AR 50.  Plaintiff stated that he drank alcohol for the high anxiety and stress he experienced, as well as his depression.  AR 53.

The ALJ asked Plaintiff what would happen if he got a job and went to work.  AR 51. Plaintiff stated, "I wouldn't maintain a good, proper thing, because every time I was working they would make fun of me, because of my inability to spell, or I couldn't do something right, and I would have to keep asking questions.  So most of the time I couldn't deal with the stress that people put me through."  AR 51.  Plaintiff's counsel asked him whether he would have difficulty remembering things if he tried to work, and Plaintiff responded affirmatively.  AR 53.  Plaintiff also testified that he would need a lot of reminders if he worked.  AR 53.  Additionally, Plaintiff stated that he had social difficulties at work because colleagues did not want to instruct him as much as he felt he needed to be instructed.  *See* AR 53.  His co-workers "would make fun of me, and they wouldn't want me to be there so they would all put a vote in to make me go home early."  AR 55.  Plaintiff stated that he always moved to different jobs because his co-workers

and supervisors decided they did not want him to be at work, and his inability to fit in and find his place at work made him stressed out and depressed. AR 55-56.

## V.     ANALYSIS

Plaintiff contends that the ALJ erred by omitting non-exertional (or mental) limitations from the opinions of Dr. Arcuri, Dr. Wewerka, and Dr. Castro. Pl.'s Mot. 18-21. Plaintiff's arguments are unavailing, either because the limitations Plaintiff alleges were omitted from the RFC actually were incorporated into it, or because applicable Tenth Circuit case law allowed the ALJ to account for the limitations by limiting Plaintiff to simple work in the RFC. Plaintiff also alleges that the ALJ did not engage in the required materiality determination regarding DAA as required by SSR 13-2p. While the ALJ did not actually make an explicit finding that Plaintiff was disabled considering all of his impairments, including DAA, no other reasonable fact finder following the correct analysis would have concluded that Plaintiff's other impairments are disabling by themselves, and thus Plaintiff would not have been found to be disabled even if the ALJ had conducted the materiality determination set forth by SSR 13-2p. The Court therefore concludes that the ALJ did not err, and his decision should be affirmed.

### A.     The ALJ Did Not Err by Omitting Non-Exertional Limitations

With respect to Dr. Arcuri's opinion, Plaintiff asserts that the ALJ omitted the following limitations without adequate explanation as to why he did so: (1) Plaintiff's need for "hands-on/verbal training with supervision until tasks are mastered [and] reminders in [the] form of pictures and diagrams" [*id.* at 18 (quoting AR 310)], (2) Plaintiff's limitation sustaining concentration [*id.* at 19], and (3) Plaintiff's limitation regarding oral reception, "requiring extra time for the delivery of oral instructions" and "delivery of work instructions both orally and visually." *Id.* at 19. The Commissioner responds that Dr. Arcuri "noted a largely normal mental

status examination" and "recommended non-timed tasks in order for Plaintiff to succeed in the workplace." Def.'s Resp. 7. She reasons that because the ALJ gave Dr. Arcuri's opinion significant - rather than controlling - weight, and assessed a "very restrictive" RFC, the ALJ did not err in omitting certain of Dr. Arcuri's recommended limitations. *Id.* at 8.

Dr. Arcuri did not elaborate on Plaintiff's limitation sustaining concentration, and did not find that Plaintiff cannot sustain his concentration for a two-hour period. Plaintiff's RFC therefore takes into account his limitation sustaining concentration as assessed by Dr. Arcuri, because the RFC limits Plaintiff both to simple work tasks and simple decision making but not at a production pace. *See* AR 17; *see also Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (alteration and internal quotation marks omitted) ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on [a specific] functional capacity . . . because the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record.").

Plaintiff's RFC also adequately allows for extra time for delivery of oral instructions, as well as delivery of work instructions visually, because Plaintiff is limited to simple work tasks and simple work decisions. *See id.* Further, the jobs that the VE identified that Plaintiff can perform with his RFC are all unskilled – cook helper, laundry laborer, and garment sorter – and they all focus on non-verbal tasks. *See* AR 17, 61. The ALJ therefore adequately incorporated Dr. Arcuri's concerns about Plaintiff's need for additional time for delivery of instructions, as well as delivery of those instructions in alternative methods.

With respect to Dr. Arcuri's limitation that Plaintiff required hands-on/verbal training with supervision until tasks are mastered, Plaintiff relies on the Tenth Circuit's opinions in *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007), and *Frantz v. Astrue*, 509 F.3d 1299 (10th Cir. 2007),

to argue that the ALJ should have included Dr. Arcuri's limitation, and should not have included in the RFC a finding that Plaintiff can interact occasionally with supervisors. *See* Pl.'s Mot. 18-19. But *Haga* and *Frantz* offer Plaintiff no refuge here, because both cases concern an ALJ's failure to explain why he or she rejected certain moderate restrictions while appearing to adopt others from an *uncontradicted* medical opinion, which is not what the Court has before it in Dr. Arcuri's opinion. *See Haga*, 482 F.3d at 1208; *Frantz* 509 F.3d at 1303 ("While we recognize that an ALJ does not have to discuss every piece of evidence, he or she is required to discuss the *uncontroverted* evidence not relied upon and significantly probative evidence that is rejected.") (internal citations omitted). Dr. Arcuri's opinion regarding supervision is contradicted by Dr. Wewerka's opinion on the same topic; Dr. Wewerka concluded that Plaintiff is not significantly limited in his ability to sustain an ordinary routine without special supervision. AR 78. Dr. Wewerka also concluded that Plaintiff is only moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors [AR 78], which is inconsistent with Dr. Arcuri's opinion that Plaintiff actually requires additional supervision and guidance in order to master tasks.

"'The trier of fact has the duty to resolve' [the] 'not uncommon situation of conflicting medical evidence' . . . We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Sec. of Health and Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991) (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)) (other internal citation omitted). In this case, the ALJ resolved any conflict between Dr. Arcuri's and Dr. Wewerka's opinions by adopting Dr. Wewerka's limitation (that Plaintiff is able to interact occasionally with supervisors) in Plaintiff's RFC. The ALJ was not required to do anything more, and Plaintiff does not cite to any case law, statute, or regulation that dictates otherwise.

Regarding Dr. Wewerka's and Dr. Castro's opinions, Plaintiff argues that the ALJ omitted the following limitations from their opinions without adequate explanation: (1) Plaintiff's moderate limitation in ability to maintain attention and concentration for extended periods, (2) his moderate limitation in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and (3) his moderate limitation to perform at a consistent pace without an unreasonable number and length of rest periods. Pl.'s Mot. at 20. Because the ALJ included these limitations in his hypothetical question to the VE by allowing for Plaintiff to be off-task for fifteen minutes every two hours and absent from the workplace for two days each month, which the VE testified would preclude competitive employment, Plaintiff argues that the ALJ should have likewise included these limitations in his RFC. *Id.* at 21.

The Commissioner responds that the moderate limitations the ALJ omitted from Dr. Wewerka's and Dr. Castro's opinions are from Section I of the mental RFC form ("MRFCA"), which is merely a worksheet that does not constitute part of the mental RFC assessment. Def.'s Resp. 9. Instead, the Commissioner asserts, Section III constitutes the consultant's formal mental RFC assessment, and ALJs are to rely on the Section III narrative as the RFC assessment. *See id.* at 10. According to the Commissioner, the ALJ accorded significant weight to Dr. Wewerka's and Dr. Castro's opinions, and Plaintiff's RFC is actually more restrictive than their mental RFC assessments for Plaintiff. *See id.* at 11. The Commissioner also contends that the Tenth Circuit's decision in *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016), permitted the ALJ to "account for moderate limitations by limiting the claimant to particular kinds of work activity[.]" *See id.* at 12. Consequently, accordingly to the Commissioner, the ALJ did not err. *See id.*

The Court concludes that the ALJ did not err in omitting the moderate limitations at issue. First, no medical opinion included the limitation that Plaintiff would be off-task for fifteen minutes every two hours and would be absent from the workplace for two days each month. It is unclear to the Court where these limitations come from, but they do not originate from any medical opinion in the record. Dr. Arcuri assessed some limitation in persistence and concentration due to "attentional problems," which "impact his ability to shift focus among tasks to some degree and could interfere with task completion[,]" but Dr. Arcuri was not more specific than that in terms of how off-task Plaintiff would be during any given workday. Indeed, as the ALJ points out, Plaintiff told Dr. Arcuri that he "has no problems tolerating a regular work day," but "he does experience chronic pain and this could sometimes affect this." AR 310.

Second, the moderate limitations Plaintiff identifies as not being included in the RFC are accounted for by the ALJ's limitation of Plaintiff to simple work and simple decisions related to that work. *See* Pl.'s Mot. 20. Applicable Tenth Circuit case law explains why this approach is permissible. First, in *Haga*, the court held that an ALJ erred in failing to explain why he adopted some of a consultative examiner's restrictions but rejected others. *See* 482 F.3d at 1208. The court remanded "so that the ALJ [could] explain the evidentiary support for his RFC determination." *Id.* The Tenth Circuit expressly applied *Haga* and its reasoning to the opinions of non-examining physicians in *Frantz*, 509 F.3d at 1302–03. *Haga*'s holding that an "ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability" has become known as the "pick and choose" rule. 482 F.3d at 1208.

More recent decisions of the Tenth Circuit have clarified the application of *Haga*, but none have overruled it. First, in 2015, the Tenth Circuit held it is not always necessary for the

ALJ to make specific limitations in the RFC for concentration, persistence and pace. *Vigil v. Colvin*, 805 F.3d 1199, 1203-04 (10th Cir. 2015). In *Vigil*, the Tenth Circuit concluded that the ALJ adequately accounted for moderate limitations in concentration, persistence and pace by limiting the plaintiff to unskilled work. *Id.* The plaintiff in *Vigil* had impaired delayed recall, inability to spell in reverse, and could not recall the President's name, leading the ALJ to conclude that the plaintiff "could not be expected to perform complex tasks." *Id.* at 1203. *Vigil* noted that unskilled work generally requires only the following: (1) understanding, remembering, and carrying out simple instructions; (2) making judgments that are commensurate with the functions of unskilled work – i.e., simple work-related decisions; (3) responding appropriately to supervision, co-workers and usual work situations; and (4) dealing with changes in a routine work setting. *Id.* at 1204 (quoting SSR 96-9p, 1996 WL 374185, at *9 (July 2, 1996)).

In 2016, the Tenth Circuit ratified *Vigil*'s holding that "an administrative law judge can account for moderate limitations by limiting the claimant to particular kinds of work activity." *Smith*, 821 F.3d at 1269 (citing *Vigil*, 805 F.3d at 1204). In *Smith*, the Tenth Circuit reviewed an ALJ's RFC determination based on a non-examining physician's assessment of nine moderate non-exertional limitations. *Id.* at 1268. These nine limitations were: (1) maintaining concentration, persistence, and pace; (2) remaining attentive and keep concentration for extended periods; (3) working with others without getting distracted; (4) completing a normal workday and workweek without interruption for psychologically based systems; (5) performing at a consistent pace without excessive rest periods; (6) accepting instructions and respond appropriately to criticism by supervisors; (7) getting along with coworkers or peers without distracting them or engaging in behavioral extremes; (8) responding appropriately to changes in the workplace; and (9) setting realistic goals or engaging in independent planning. *Id.* In her

RFC narrative, the non-examining physician omitted the majority of the nine limitations and recommended instead that the claimant "could (1) engage in work that was limited in complexity and (2) manage social interactions that were not frequent or prolonged." *Id.* The ALJ adopted the recommendation and found that the claimant "(1) could not engage in face-to-face contact with the public and (2) could engage in only simple, repetitive, and routine tasks." *Id.* at 1269. "Through these findings," the Tenth Circuit held, "the [ALJ] incorporated the functional limitations of [the claimant's] moderate nonexertional limitations." *Id.* Smith reasoned that the "notations of moderate limitations served only to aid [the physician's] assessment of residual functional capacity." *Id.* at 1269, n.2. Correspondingly, the Tenth Circuit explained that the court's function is not to compare the ALJ's findings to a physician's "notations of moderate limitations," but rather to compare the ALJ's findings to the physician's opinion. *Id.*

Plaintiff asserts that the ALJ failed to include, from Dr. Wewerka's and Dr. Castro's opinions, Plaintiff's moderate limitation in ability to maintain attention and concentration for extended periods, in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and in ability to perform at a consistent pace without an unreasonable number and length of rest periods. Pl.'s Mot. 20. Each of those limitations is included in *Smith* as a limitation that can be accounted for by the ALJ's limiting of Plaintiff to simple work and simple decision making. *See* 821 F.3d at 1268-69 (finding it permissible for ALJ to incorporate moderate nonexertional limitations by limiting claimant to no face-to-face contact with the public and simple, repetitive, and routine tasks). The Court therefore agrees with the Commissioner, and concludes that the ALJ did not err in failing to include certain moderate limitations from Dr. Wewerka's and Dr. Castro's opinions in Plaintiff's RFC.

**B.** **The DAA Materiality Analysis Was Not Required Because Plaintiff Is Not Disabled, Even Taking into Account His Alcohol Abuse**

Plaintiff alleges that the ALJ failed to conduct steps two through six of the DAA materiality analysis set forth by SSR 13-2p, which he claims constitutes reversible error. Pl.'s Mot. 23-24. The Commissioner responds that the ALJ found Plaintiff to not be disabled even including his alcohol abuse, which the ALJ found to be a severe impairment. Def.'s Resp. 13. The ALJ's analysis, therefore, "was entirely in line with the governing SSR even though he did not explicitly cite to the SSR, and Plaintiff's arguments to the contrary should be rejected." *Id.*

Unfortunately, Plaintiff fails to adequately discuss what is required before the DAA materiality analysis has to be done by the ALJ. The governing statute provides that, for the purpose of defining disability, "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C) (2012). In other words, in order to reach the materiality consideration, the ALJ must have already determined that the claimant is disabled. According to the Tenth Circuit, "[t]he implementing regulations make clear that a finding of disability is a condition precedent to an application of § 423(d)(2)(C)." *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001). *Drapeau* continued:

> The Commissioner must first make a determination that the claimant is disabled. He must then make a determination whether the claimant would still be found disabled if he or she stopped abusing alcohol. If so, then the alcohol abuse is not a contributing factor material to the finding of disability. If, however, the claimant's remaining impairments would not be disabling without the alcohol abuse, then the alcohol abuse is a contributing factor material to the finding of disability. The ALJ cannot begin to apply § 423(d)(2)(C) properly when, as here, he has not yet made a finding of disability.

*Id.* at 1214-15 (internal citations omitted); *see also Trivino v. Colvin*, Civ. No. 15-102 MV/GJF, 2016 WL 9777214, at *5 (D.N.M. Sept. 29, 2016) (unpublished) ("The ALJ must follow this procedure [for evaluation of whether a claimant who has limitations caused by DAA is disabled only because of drug or alcohol abuse] if he finds that the claimant is disabled and the claimant's record contains medical evidence of his or her drug addiction or alcoholism.") (internal citations, quotation marks, and alteration omitted).

The Court recognizes that SSR 13-2p was issued in 2013, twelve years after *Drapeau* was decided. But SSR 13-2p recognizes the same threshold requirement as did *Drapeau*:

> When we adjudicate a claim for disability insurance benefits (DIB), Supplemental Security Income (SSI) payments based on disability, or concurrent disability claims include [sic] evidence from acceptable medical sources as defined in 20 CFR 404.1513 and 20 CFR 416.913 establishing that DAA is a medically determinable impairment(s) (MDI) *and we determine that a claimant is disabled considering all of the claimant's medically determinable impairments (MDIs)*, we must *then* determine whether the claimant would continue to be disabled if he or she stopped using drugs or alcohol; that is, we will determine whether DAA is "material" to the finding that the claimant is disabled.

2013 WL 621536, at *2 (emphases added).

In this case, the ALJ did not determine that Plaintiff was disabled considering all of his medically determinable impairments including alcohol abuse, which the ALJ found to be severe. *See* AR 14-17. The ALJ was therefore not required to proceed to step three of the analysis in SSR 13-2p, because the ALJ already found Plaintiff to not be disabled considering all of his impairments, including alcohol abuse. *See id.*; Pl.'s Mot. 22-24. Instead, Plaintiff's argument is essentially a request that the Court re-weigh the evidence, including the opinions of Dr. Wewerka and Dr. Castro, to reach a different outcome at step two and find that Plaintiff actually is disabled considering all of his impairments. *See* Pl.'s Mot. 23-24. It is not the role of this

Court to re-weigh such evidence, so the Court declines to do so.  *See Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.

To support his argument that the ALJ wrongly decided that Plaintiff was not disabled considering all of his impairments, Plaintiff asserts that the ALJ actually included the caveat from Dr. Wewerka's and Dr. Castro's mental RFC assessment for Plaintiff that "if the claimant can maintain abstinence and sobriety, he can understand, remember, and carry out detailed but not complex instructions . . . ."  Pl.'s Mot. 23 (citing AR 22).  While the ALJ did refer to their caveat in his decision, the ALJ did not identify any limitations in Plaintiff's RFC to take into account Plaintiff's substance abuse.  Further, Plaintiff does not actually argue that the ALJ should have included limitations to take into account Plaintiff's substance abuse.  The Court refuses to shoehorn Plaintiff's argument that the ALJ did not follow the procedure set forth by SSR 13-2p into a different argument that the ALJ did not properly account for Plaintiff's substance abuse in his RFC when Plaintiff did not brief the latter argument.

To further support his argument that the ALJ wrongly decided that Plaintiff was not disabled considering all of his impairments, Plaintiff also asserts that the ALJ did not explain his conclusions that "[Plaintiff's] sporadic treatment and improvement when he chooses to abstain from marijuana and alcohol, as well as his tendency to relay inconsistent information to his treating providers, suggests that [Plaintiff] can sustain a greater capacity than he described at the hearing."  *See* Pl.'s Mot. 23 (quoting AR 25).  These comments still do not require the ALJ to have proceeded to step three of the DAA materiality analysis, as Plaintiff urges.  *See* Pl.'s Mot. 23-24.  Again, the ALJ needed first to have determined that Plaintiff was disabled due to all of his impairments before proceeding with the DAA materiality analysis.  Having reached a determination to the contrary, the ALJ was under no obligation to complete that analysis.

If Plaintiff's argument is taken to its logical conclusion, Plaintiff is essentially arguing that his RFC is even more restrictive once the ALJ takes into account his substance abuse. But in the context of the DAA materiality analysis, even if the ALJ had determined that Plaintiff was disabled considering all of his impairments, the ALJ would have next proceeded to determine whether Plaintiff's other impairments are disabling by themselves. Nothing in the record, Plaintiff's briefing on appeal, or the ALJ's decision indicates that the ALJ would have concluded that Plaintiff's other, non-DAA impairments are disabling by themselves, and Plaintiff's briefing does not address that issue. If the ALJ had found Plaintiff's other, non-DAA impairments to not be disabling by themselves, but nonetheless had found Plaintiff to be disabled, then the ALJ necessarily would have concluded that Plaintiff's substance abuse is material, and denied him benefits all the same. Even worse for Plaintiff is that he implies that his substance abuse magnifies the severity of his impairments, *see* Pl.'s Mot. 23-24, which would result in a denial of benefits, because then his substance abuse would be material to his disability. Accordingly, the Court concludes that the ALJ did not err by failing to conduct the DAA materiality analysis set forth by SSR 13-2p.

VI.     **CONCLUSION**

For the foregoing reasons, the Court holds that the ALJ's decision was supported by substantial evidence and the correct legal standards were applied.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum [ECF No. 18] is **DENIED.**

**IT IS FURTHER ORDERED** that the Commissioner's final decision is **AFFIRMED** and that the instant cause is **DISMISSED.**

**IT IS SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*